UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

OVIEDO TOWN CENTER II, L.L.L.P.;
OVIEDO LHC I, L.L.C.; OVIEDO LHC
II, L.L.C.; OVIEDO LHC III, L.L.C.;
OVIEDO LHC IV, L.L.C.; OVIEDO
TOWN CENTRE DEVELOPMENT
GROUP, L.L.L.P.; OVIEDO TOWN
CENTRE II PARTNERS, L.L.L.P.;
OVIEDO TOWN CENTRE III, L.L.L.P.;
OVIEDO TOWN CENTRE IV, L.L.L.P.;
ATLANTIC HOUSING PARTNERS
L.L.L.P.; CONCORD MANAGEMENT,
LTD.; SOUTH FORK FINANCIAL,
L.L.C.; and CPG CONSTRUCTION,
L.L.L.P.,

          Plaintiffs,

v.                                      Case No. 6:16-cv-1005-Orl-37GJK

CITY OF OVIEDO, FLORIDA

          Defendant.

_____

## <u>ORDER</u>

This action stems from a dramatic increase in water utility rates assessed for the Oviedo Town Centre ("**OTC**")—an affordable-housing apartment complex serving low-income households. (*See* Doc. 52.) Specifically, in 2012, Defendant, the City of Oviedo, Florida ("**the City**"), amended its base charges for water services in multifamily residential properties, causing OTC to suffer a more than 2,000% increase. Arguing that the increased rates would preclude Plaintiffs from providing affordable housing to OTC residents—the majority of whom are racial minorities—Plaintiffs: (1) filed suit under the

federal Fair Housing Act and Florida's analogue statute ("**FHA Claims**")[1]; and (2) later added a due process claim under 42 U.S.C. § 1983 ("**Due Process Claim**").

On May 1, 2017, Plaintiffs moved for summary judgment with respect to the FHA Claims. (*See* Docs. 57.) That same day, the City simultaneously moved to dismiss Plaintiffs' Due Process Claim (*see* Doc. 62 ("**MTD**")) and filed a motion for summary judgment on all of Plaintiffs' claims (*see* Doc. 64). For the reasons set forth below, Plaintiffs' summary judgment motion is due to be denied, the City's summary judgment motion is due to be granted in part, and the MTD is due to be granted in part.

## I. BACKGROUND

### A. Development of Oviedo Town Centre

Plaintiffs in this action comprise a group of professionals with significant experience in developing and managing affordable housing. (*See* Doc. 82-2, pp. 6, 22–31.) Amid the collapsing housing market, Plaintiffs commenced development of OTC, an affordable-housing apartment community, consisting of twelve buildings and 236 units. (Doc. 70-1, ¶¶ 12, 17; Doc. 82-1, p. 1.)

As is common with complex real estate transactions, Plaintiffs sought construction financing. (*See* Doc. 70-1, ¶ 9.) In 2007, the Orange County Housing Finance Authority approved bond financing ("**Bond**") with the condition that Plaintiffs obtain secondary

---

[1] "The Florida Fair Housing Act contains provisions that are substantively identical to the federal Fair Housing Act . . . ." *See Loren v. Sasser*, 309 F.3d 1296, 1299 n.9 (11th Cir. 2002). Hence the Court will apply the same analysis to Plaintiffs' federal and state-law claims. *See, e.g., Alley v. Les Chateaux Condo. Ass'n*, No. 8:10-cv-760-T-33TGW, 2010 WL 4739508, at *3 (M.D. Fla. Nov. 16, 2010).

financing through the Florida Housing State Apartment Loan ("**SAIL**") Program,[2] which they secured in 2008. (*See* Doc. 82-1, pp. 1–2; *see also* Doc. 82-2, p. 10.)[3] These funding sources restricted resident eligibility for OTC and the amount of rent Plaintiffs could collect from residents.[4] (Doc. 70-1, ¶ 9.) The Bond also required that each of OTC's 236 units be individually metered for electrical, water, and sewer services ("**Individual Meter Requirement**"). (Doc. 82-2, p. 16.)

After Plaintiffs completed construction of OTC in 2008, each building was equipped with a single master meter that was connected to the City's water distribution system. (Doc. 70-1, ¶¶ 5, 12; *see also* Doc. 82-1, p. 2.) In accordance with the Individual Meter Requirement, OTC also included sub-meters within each individual unit, which were used to determine each unit's proportional share of the utility cost. (Doc. 54-2, p. 180.) Consequently, OTC residents initially shouldered the responsibility for paying their own utility costs. (*Id.* at 181.) But, in December of 2011, Plaintiffs began paying for utilities on behalf of OTC residents. (Doc. 84-2, p. 10.) This switch gave Plaintiffs the ability to collect a gross rent without reducing such amount by a utility allowance.[5]

---

[2] The SAIL Program provides mortgage loans and loan guarantees to developers of low-income housing. *See* Fla. Stat. § 420.5087.

[3] (*See also* Docs. 61-39; 61-40; 61-41; 61-42.)

[4] For instance, the SAIL loans required that 100% of OTC units be set aside for tenants at or below 60% of the area median income. (Doc. 82–1, pp. 1–2.)

[5] The Court's understanding of OTC's rent assessment is as follows: OTC must cap their residents' rent payments—inclusive of utilities. (*See* Doc. 82-1, p. 8.) Accordingly, OTC has the option of either paying the utilities on the residents' behalf or requiring the residents to pay for utilities directly. (*Id.* at 8–9.) In the latter circumstance, OTC would reduce a resident's rent payment to satisfy the rent caps. (*Id.* at 5, 9.)

(Doc. 54-2, pp. 180–81.)

To mitigate the risk of default, Plaintiffs provided several guarantees. (Doc. 82-2, p. 7; Doc. 82-14, pp. 6–8.) Specifically, Plaintiffs' partnership agreements required the general partners to finance operating deficiencies with non-interest bearing loans (**"Operating Deficit Guarantee"**). (*See* Doc. 82-1, p. 14.) In addition, a third-party, Allan H. Ginsburg, along with his related trust, provided operating and completion guarantees and an individual recourse guarantee[6] for the full amount of the SAIL loans for the life those loans (**"Ginsburg Guarantees"**). (Doc. 82-2, pp. 7, 21.)

## B.    The City's Utility Rates

Once a property becomes a utility customer, the City assesses a monthly amount for water comprised of a variable usage charge and a flat fee or base charge.[7] (*See* Doc. 70-1, ¶ 13; *see also* Doc. 65-1, p 30.) The city council sets base charges by resolution (**"Base Charge Resolutions"**). *See* OVIEDO, FLA. ORDINANCES ch. 54, art. II, § 54-23.

From 2007 to 2011, the City's Base Charge Resolutions classified water utility customers as either residential or commercial property.[8] (*See* Docs. 66-1, 66-2, 66-3, 66-4,

---

[6] Recourse refers to the right to repayment of a loan from the borrower's personal assets, not just from the collateral used to secure the loan. Recourse, BLACK'S LAW DICTIONARY (9th ed. 2009).

[7] *See also* OVIEDO, FLA. ORDINANCES ch. 54, art. II, § 54-23.

[8] While Resolution 2146-10 and Resolution 2218-10 set forth different base charge classifications for "master-metered" and "individually-metered" residential properties (Doc. 66-3, p. 3; 66-4, p. 3), such language was apparently a "scrivener's error." (*See* Doc. 66-3 (removing the term "master-metered residential" in Resolution 2146-10); *see also* (Doc. 66-5, p. 1 (removing the term "individually-metered" in Resolution 2218-10).) As amended, both resolutions provided a binary classification—residential or commercial.

66-5.) Despite the sub-meters within OTC, it is undisputed that from 2008 through 2012, the City assessed OTC base charges on a *per-meter* basis by master meter only, which amounted to approximately $339 per month in base charges for OTC's twelve buildings. (Doc. 70-1, ¶¶ 13, 18; Doc. 82-1, p. 2.)

### C.     The 2012 Rate Study and Resolution

In late 2012, the City engaged a third party consultant, Public Resource Management Group ("**PRMG**"), to conduct a Water and Wastewater Rate and Capital Recovery Charge Study ("**2012 Rate Study**"). (*See* Doc. 60-2; 65-1, p. 25). The objective of the 2012 Rate Study was to set proposed utility rates at a level sufficient to cover the City's maintenance and operating costs. (*See* Doc. 60-2, p. 2.) Based on the 2012 Rate Study's findings and recommendations, the City adopted Resolution 2576-12 on December 3, 2012. (*See* Doc. 66-6 ("**2012 Resolution**").)

In addition to distinguishing between residential and commercial properties as the previous resolutions had done, the 2012 Resolution: (1) differentiated single-family residential properties from master-metered multi-family residential properties ("**Multifamily Properties**"); and (2) set a *per-unit* base charge for Multifamily Properties ("**2012 Policy**"). (*Id.*) Because OTC is a Multifamily Property, in 2013, the City began assessing OTC water base charges on a per-unit basis for OTC's 236 units. (*See* Doc. 82-1, pp. 2–3.) Plaintiffs thereafter requested an exception from the 2012 Policy ("**Exception Request**") (*see* Doc. 70-1, ¶ 22), but the City denied their request in May of 2016 (*id.* ¶ 23).

### D.    Plaintiffs' Allegations

Following the City's denial of the Exception Request, Plaintiffs filed the FHA Claims against the City, alleging that it arbitrarily refused to return OTC to a per-meter base charge. (Doc. 52.) Specifically, Plaintiffs allege that the 2012 Policy causes them significant financial harm by increasing their base charges by more than 2,000%—about $7,557 per month. (*Id.* ¶¶ 33, 36, 42.) According to Plaintiffs, they cannot continue to operate OTC as an affordable-housing community under such an inflated utility cost and, if required to close, housing will become "unavailable" in Oviedo. (*Id.* ¶¶ 39, 41.) A substantial portion of Plaintiffs' FHA Claims seem to rest on the fact that the majority of OTC's heads of household are racial minorities. (*See id.* ¶¶ 41–42; *see also* Doc. 70-1, ¶ 26; Doc. 70-2, p. 2.) To this end, Plaintiffs maintain that, if OTC is forced to close, OTC's racial minority residents will be disparately impacted by the reduced housing options. (Doc. 52, ¶ 41.) Additionally, Plaintiffs claim that they will lose the benefits of various operating agreements. (*Id.* ¶¶ 40–42.)

As for their Due Process Claim, Plaintiffs allege that the City violated their substantive due process rights because the per-unit base charges have no rational nexus to the City's stated purpose for imposing such charges. (Doc. 52 ¶ 74; *see also* Doc. 100.)[9] According to Plaintiffs, the increase in base charges: (1) exceeds a pro rata share of the

---

[9] Due to Plaintiffs' sparse allegations concerning the Due Process Claim, the Court directed the parties to submit additional briefing. (Doc. 99.) Both parties complied. (Docs. 100, 102.) Hence, in resolving the MTD, the Court will consider the parties' additional briefing along with Plaintiffs' allegations in the operative Complaint (Doc. 52).

City's anticipated utility costs; and (2) denies them all reasonable use of OTC. (Doc. 100, p. 4; *see also* Doc. 52, ¶¶ 71–73, 75.)

As the motions are fully briefed (*see* Docs. 80, 81, 85, 94, 95), the matters are now ripe for the Court's determination.

## II.     THE SUMMARY JUDGMENT MOTIONS

### A.     LEGAL STANDARDS

#### 1.     Summary Judgment

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). As to issues for which the movant would bear the burden of proof at trial, "[it] must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the nonmoving party on all of the essential elements of its case." *Landolfi v. City of Melbourne, Fla.*, 515 F. App'x 832, 834 (11th Cir. 2012) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)).

As to issues for which the nonmovant would bear the burden of proof at trial, the movant has two options: (1) it may simply point out an absence of evidence to support the nonmoving party's case; or (2) it may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *U.S. v. Four Parcels of Real Prop. in Green & Tuscaloosa Ctys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex*

*Corp.*, 477 U.S. at 325). "The burden then shifts to the nonmoving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17).

"A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmovant, *Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006), such that "when conflict arises between the facts evidenced by the parties, [the] court credit[s] the nonmoving party's version," *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005). However, "[the] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the nonmovant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996). This standard is not altered by cross motions for summary judgment and "will not, in themselves, warrant a court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *Bricklayers Int'l Union Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1979).[10] Nevertheless, "cross motions may be probative of the non-existence of a factual dispute." *Id.*

---

[10] Decisions of the former Fifth Circuit rendered before October 1, 1981 are binding on this Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

## 2. The Fair Housing Act

The FHA prohibits racial discrimination, in selling, renting, or otherwise making a dwelling unavailable. 42 U.S.C. § 3604(a). Liability under the FHA encompasses both disparate treatment and disparate impact claims. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2533 (2015); *see also Hallmark Dev., Inc. v. Fulton Cty., Ga.*, 466 F.3d 1276, 1286 (11th Cir. 2006); *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1559 n.20 (11th Cir. 1984). Disparate treatment claims require a plaintiff to establish that "the defendant had a discriminatory intent or motive." *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)). In contrast, disparate-impact claims challenge practices that have a "disproportionately adverse effect on minorities and are otherwise unjustified by a legitimate rationale." *Inclusive Cmtys.*, 135 S. Ct. at 2513. To establish discriminatory effect, and thus demonstrate that housing has become discriminatorily "unavailable" to a protected class, a plaintiff can either show that the decision has a segregative effect or that it makes housing options significantly more restrictive for members of a protected group than for persons outside that group. *See Hallmark Dev., Inc.*, 466 F.3d at 1286; *see also* 24 C.F.R. § 100.500(a).

In disparate-impact cases, courts employ a burden-shifting framework, which requires plaintiffs to first establish a prima facie case. *Id.* at 2514. The burden then shifts to the defendant to prove that the challenged practice "is necessary to achieve one or more [of its] substantial, legitimate, nondiscriminatory interests." 24 C.F.R. § 100.500(b)(1), (c)(2). Such interests must be supported by evidence and may

not be hypothetical or speculative. 24 C.F.R. § 100.500(b)(2). If the defendant satisfies its burden, the plaintiff may still prevail by proving that the defendant's interests could be served by another practice that has a less discriminatory effect. 24 C.F.R. § 100.500(c)(3).[11]

Additionally, plaintiffs prosecuting FHA claims must demonstrate proximate cause. "The FHA permits any 'aggrieved person' to bring a housing-discrimination lawsuit" and "defines 'aggrieved person' as any person who either claims to have been injured by a discriminatory housing practice or believes that such an injury is about to occur." *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1303 (2017). However, "proximate cause generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Id.* at 1306 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014)). Thus, "proximate cause under the FHA requires some direct relation between the injury asserted and the injurious conduct alleged." *Bank of Am. Corp.*, 137 S. Ct. at 1306 (quoting *Holmes Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)).

B.     ANALYSIS

Plaintiffs' FHA Claims rest on two interrelated theories of harm. First, that the 2012 Policy's increased utility rates will force OTC to close. (*See* Doc. 52, ¶¶ 39, 42.) Second, that OTC's closure, will have a disparate impact on minorities living in OTC by reducing their affordable housing options. (*See id.* ¶ 41.) To succeed on their FHA Claims, Plaintiffs

---

[11] *See also Inclusive Cmtys.*, 135 S. Ct. at 2514–15 (citing Housing and Urban Development's burden-shifting framework for disparate impact liability under the FHA).

must establish that both their projected financial injuries and the resulting disparate impact on OTC's residents flow from the 2012 Policy.[12]

After review of the record, the Court finds that the FHA Claims fail. As an initial matter, Plaintiffs have not demonstrated that their own injuries were proximately caused by the City's imposition of the 2012 Policy. Additionally, Plaintiffs have not: (1) carried their burden of establishing a prima facie case of disparate impact; or (2) rebutted the City's evidence that its imposition of the 2012 Policy and denial of Plaintiffs' Requested Exception were necessary to achieve a legitimate, nondiscriminatory interest.

### 1. Proximate Causation

The Court begins its analysis be addressing proximate causation—that is, whether the City's imposition of the 2012 Policy proximately caused Plaintiffs to become economically unviable. The Court finds that it did not. Under the FHA, a plaintiff must demonstrate more than foreseeability to establish that a challenged housing practice proximately caused its injuries. *Bank of Am. Corp.*, 137 S. Ct. at 1305–06. Rather, as

---

[12] The FHA permits suits by non-minorities, so long as their injuries are somehow affected by a racial interest. *See Bank of Am. Corp.*, 137 S. Ct. at 1303 (noting that FHA claims were permitted by white tenants claiming they were deprived of benefits from interracial associations where rental practices excluded minorities from their apartment complex) (citing *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209–12 (1972))); *see also, e.g., Baytree of Inverrary Realty Partners v. City of Lauderhill*, 873 F.2d 1407, 1408–09 (11th Cir. 1989) (finding that the non-minority developer-plaintiff had standing to sue under the FHA because it was asserting its own injury from racially discriminatory zoning decisions); *see also Nasser v. City of Homewood*, 671 F.2d 432, 437 (11th Cir. 1982) (finding that the landowner-plaintiff did not have standing, as he failed to show more than an economic interest affected by the defendant's zoning decision). Here, the record does not demonstrate that Plaintiffs' financial injuries are proximately caused by a racial interest.

previously mentioned, there must be "some direct relation between the injury asserted and the injurious conduct alleged," so that the alleged harm is not "too remote from the defendant's unlawful conduct." *Id.* at 1306. As the U.S. Supreme Court recently noted, "the housing market is interconnected with economic and social life. A violation of the FHA may, therefore, be expected to cause ripples of harm to flow far beyond the defendant's misconduct." *Id.* at 1306. But the FHA was not intended "to provide a remedy wherever those ripples travel." *Id.* Here, the ripples have traveled too far.

Throughout their briefing, Plaintiffs argue that affordable housing will become "unavailable" because OTC cannot remain economically viable under the burden of the 2012 Policy's per-unit base charge. (*See* Doc. 57, p. 7; Doc. 81, pp. 11–12; Doc. 95, pp. 4–5.) As a result, Plaintiffs maintain that they will be deprived of the benefits of various operating agreements. (Doc. 52, ¶ 42.) In support, Plaintiffs submit an affidavit from Paul Missigman ("**Mr. Missigman**"), who is responsible for the financial affairs of OTC. (*See* Doc. 71-1.) In the affidavit, Mr. Missigman avers that: (1) OTC's financing was structured around the per-meter base charges in place in 2008; and (2) Plaintiffs' projected losses as a result of the City's denial of their Exception Request will be nearly $4 million. (*Id.* ¶¶ 4, 6, 7, 10; *see also* Doc. 71-2.)

For its part, the City paints a drastically different picture of OTC's continued economic viability. (Doc. 64, pp. 18–22; Doc. 94, pp. 7–8.) Specifically, the City's expert, forensic accountant Gail Markham ("**Ms. Markham**"), concludes that OTC is capable of meeting its financial obligations and continuing as an affordable-housing community.

(Doc. 82-1, p. 14.) Ms. Markham's review of OTC's financials reveals that: (1) until the imposition of the 2012 Policy, Plaintiffs' decision to pay for utilities directly—rather than passing the responsibility on to OTC residents—resulted in an overall gain to OTC, as its utility allowance was higher than actual utility expenses[13]; (2) had OTC residents continued to be responsible for their own utilities, they would have borne any relative base charge increase; (3) despite higher-than-expected utility expenses from 2009 to 2015, OTC's total operating expenses were less than projected, even after the imposition of the 2012 Policy; and (4) OTC's net operating income after accounting for debt payments was positive for all relevant years, save for 2014 when OTC was responsible for a higher principal payment. (*See* Doc. 54-2, p. 81; Doc. 82-1, pp. 8–9, 11, 14.) In addition, Ms. Markham avers that even if OTC maintained poor financial performance, the Operating Deficit Guarantee and the Ginsburg Guarantees would assure OTC's continued economic viability. (Doc. 82-1, pp. 14–15.)

In turn, Plaintiffs attack Ms. Markham's findings as inaccurate, contending that she ignored OTC's other debt obligations. (Doc. 81, pp. 11–12.) But even if the Court were to accept this argument, Plaintiffs have still failed to rebut Ms. Markham's findings concerning the significant guarantees that ensure OTC's continued operation.

Importantly, the "[p]roximate cause analysis is controlled by the nature of the statutory cause of action. The question it presents is whether the harm alleged has a

---

[13] In theory, a utility allowance should approximate actual utility expenses. (*See* Doc. 82-1, p. 9.)

sufficiently close connection to the conduct the statute prohibits." *Lexmark*, 134 S. Ct. at 1390. To prevail on their FHA Claims, Plaintiffs must demonstrate that the 2012 Policy has unequally reduced housing for racial minorities, *see Hallmark*, 466 F.3d at 1286, *and* that this violation is sufficiently connected to their alleged harm, *see Lexmark*, 134 S. Ct. at 1390. The latter would be true if Plaintiffs could demonstrate that the 2012 Policy will ultimately cause OTC to close and that Oviedo has no other affordable housing options, but the City has refuted Plaintiffs' closure claim and Plaintiffs have not provided any evidence of the 2012 Policy's impact on other affordable housing in Oviedo.

What is left then is evidence that the 2012 Policy will deflate Plaintiffs' profits, but this is not the type of harm the FHA seeks to vindicate. So while the precise boundaries of proximate cause under the FHA remain undefined, *Bank of Am. Corp.*, 137 S. Ct. at 1306, they do not extend to Plaintiffs' alleged financial injuries, as the purpose of the FHA is not to provide guaranteed protection against changes in market conditions or to ensure that Plaintiffs receive the benefits of private contracts. Hence Plaintiffs have failed to draw the close connection that proximate cause requires.

### 2. Prima Facie Case

Had Plaintiffs successfully demonstrated proximate cause, they still must establish a prima facie case of disparate impact. To that end, they must demonstrate that the 2012 Policy "caused or predictably will cause a discriminatory effect." *Inclusive Cmtys.*, 135 S. Ct. at 2514 (citing 24 C.F.R. § 100.500(c)(1)). They have failed to do so.

At this stage, Plaintiffs must satisfy a "robust causality requirement" by showing

facts or statistical evidence establishing a "causal connection" between the challenged policy and the alleged disparate impact. *Inclusive Cmtys.*, 135 S. Ct. at 2523–24; *see also Hallmark Dev., Inc.*, 466 F.3d at 1286. A plaintiff who fails to produce statistical evidence demonstrating a causal connection fails to make out a prima facie case of disparate impact. *Inclusive Cmtys.*, 135 S. Ct. at 2523.

Here, Plaintiffs unsuccessfully attempt to establish that the 2012 Policy has a discriminatory effect that makes housing options significantly more restrictive for racial minorities living in OTC. (*See* Doc. 57, pp 9–10.) In support, they rely exclusively on self-created statistical evidence whereby OTC residents self-reported their race ("**Demographic Survey**").[14] (Doc. 70-1, ¶ 26; *see also* Doc. 70-2.) The Demographic Survey reflects that the composition of OTC consists of 75.73% racial minority households and 24.27% white households. (Doc. 70-2, p. 2.) In comparison, racial minority households represent only 32.7% of households in Oviedo generally, while nonminority households represent 65.8%.[15] (*Id*.) Based on these statistics, Plaintiffs conclude that the City's refusal to grant them an exception from the 2012 Policy will have a significant disparate impact on racial minorities, as the percentage of racial minority households in OTC—75.73%— far exceeds the percentage of racial minority households in Oviedo generally—32.7%.[16]

---

[14] The Demographic Survey identifies eight racial categories: (1) white alone; (2) hispanic; (3) black alone; (4) asian alone; (5) two or more races; (6) other race alone; (7) American Indian alone; or (8) hawaiian & other pacific islander alone. (Doc. 70-2, p. 2.)

[15] The Court takes judicial notice of the information on the City's website concerning its racial demographics. *See Demographics*, CITY OF OVIEDO, FLA., http://cityofoviedo.net/node/69 (last visited August 18, 2017).

[16] The City contends that the Demographic Survey is inadmissible hearsay as it

(Doc. 57, p. 11.) But Plaintiffs have drawn the wrong comparison.

The Demographic Survey fails in large measure to demonstrate that the 2012 Policy change from per-meter to per-unit base charges affected racial minorities differently than non-minorities. Rather, it reveals only that more racial minorities live in OTC than the rest of Oviedo. (Doc. 70-2, p. 2.) Standing alone, such a statistical disparity is insufficient to impose liability under a disparate impact theory. *See Inclusive Cmtys.*, 135 S. Ct. at 2522–23.[17]

The inconvenient truth is that OTC's racial imbalance is endemic to affordable housing, as such housing caters to a disproportionately higher percentage of racial minorities.[18] Regrettably, these vestiges of racial inequality remain today; but this fact does not establish the crucial element of causation. To hold otherwise ignores the FHA's

---

lacks the circumstantial guarantees of trustworthiness. (Doc. 85, p. 9.) However, the Court finds that it reflects information easily ascertained about OTC's racial composition and does not present the reliability risks that the hearsay rules are intended to prevent. Thus, the Court will consider it for purposes of summary judgment.

[17] *See also Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1218 (finding that the plaintiff failed to establish a prima facie case of disparate impact where he provided no statistical comparison and only alleged that the half-way houses he operated were allegedly affected by the defendant's actions).

[18] *See* Deborah Povich et al., *Low-Income Working Families: The Racial/Ethnic Divide*, THE WORKING POOR FAMILIES PROJECT, Winter 2014–2015, at p. 1, http://www.workingpoorfamilies.org/wp-content/uploads/2015/03/WPFP-2015-Report_Racial-Ethnic-Divide.pdf (finding that in 2013, 58% of low-income families in American were racial or ethnic minorities, despite only making up 40% of all working families nationwide); *see also* Margaret C. Simms et. al, RACIAL AND ETHNIC DISPARITIES AMONG LOW-INCOME FAMILIES, August 2009, THE URBAN INSTITUTE, at p. 1, http://www.urban.org/sites/default/files/publication/32976/411936-Racial-and-Ethnic-Disparities-Among-Low-Income-Families.PDF (finding based on a 2008 Current Population Study, that more than 50% of families that fall into the low-income category are racial minorities).

unequivocal "robust causality requirement," which "ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create." *Id.* at 2523. This principle is well-illustrated here, as the Demographic Survey fails to demonstrate the City's responsibility for the racial imbalance present in OTC. As such, Plaintiffs' statistical evidence fails to draw the requisite causal connection between the imposition of the 2012 Policy and its impact on racial minorities.[19]

### 3. Legitimate, Nondiscriminatory Interest

Even if Plaintiffs had established a prima facie case, the Court also finds that the City has demonstrated a legitimate, nondiscriminatory interest in implementing the 2012 Policy, which Plaintiffs have failed to rebut. In shifting the burden, the City is given "leeway to state or explain the valid interests served by [its] policies." *Inclusive Cmtys.*, 135 S. Ct. at 2522. Policies "are not contrary to the disparate-impact requirement unless they are artificial, arbitrary, and unnecessary barriers." *Id.* at 2525. Here, the City contends that its obligation to adequately fund its utility system is reasonable, proper, and necessary to the City's interest in serving its citizens. (Doc. 64, p. 7.) The Court agrees.

---

[19] It is worth noting that Plaintiffs may have satisfied their burden with statistical evidence demonstrating a comparison between: (1) x% of racial minorities occupying Multifamily Properties in the City and paying per-unit base charges; and (2) y% of non-minorities occupying Multifamily Properties in the City paying per-unit base charges. *See, e.g.*, *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1217 (11th Cir. 2008) (finding that plaintiffs could have established a prima facie case of disparate impact by showing that: (1) x% of recovering drug abusers with a need for group living exceeds; (2) y% of people with no substance abuse problems with a need for group living).

As support, the City points to the deposition of Gerald Boop ("**Mr. Boop**"), the City's finance director, who testified that since 1992 the City has billed base charges on a per-unit basis for Multifamily Properties like OTC. (Doc. 65-1, pp. 32, 36.) Confirming Mr. Boop's testimony, Robert Ori, president of PRMG, avers that: (1) assessing Multifamily Properties on a per-unit basis "is a reasonable and generally accepted rate practice to recover" service costs; and (2) the recommended rates set forth in the 2012 Policy are necessary to cover the City's financial obligations and future projected expenses. (Doc. 60-1, ¶¶ 15, 16.)

Plaintiffs attempt to refute the City's evidence by: (1) pointing to the prior utility rates that did not apply a per-unit base charge to Multifamily Properties; and (2) alleging that OTC was the only community impacted by the 2012 Policy. (Doc. 81, pp. 9–10.) But Plaintiffs' arguments are unavailing. First, Plaintiffs do not offer support for their bald assertion that OTC was singularly affected by the 2012 Policy. Second, while the City admits that prior to implementing the 2012 Policy, its published utility rates did not contain a Multifamily Property classification (Doc. 60-1, ¶ 12), it contends that it mistakenly billed OTC on a per-meter basis from 2008 to 2012 (Doc. 64, p. 2). In support, Mr. Boop testified that when he joined the City, he conducted an internal audit of its utility systems, which revealed that the City had incorrectly billed OTC as a single-family property instead of as a Multifamily Property. (Doc. 65-1, p. 32; *see also* Doc. 60-1, ¶ 17.) Correcting its mistake, in 2013, the City began charging OTC by reading each of the sub-meters in OTC's 236 units—rather than the master meters in each of its twelve

buildings. (Doc. 60-1, ¶ 18.) Hence the record reflects that it was the City's longstanding

practice to bill Multifamily Properties per unit, not per meter. The City's failure to bill

OTC in this manner prior to 2013 was an anomaly, the correction of which does not

implicate the FHA.[20]

### III. THE MOTION TO DISMISS

#### A. LEGAL STANDARDS

A pleading must contain "a short and plain statement of the claim showing that

the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[D]etailed factual allegations" are

not required, but "[a] pleading that offers 'labels and conclusions' or 'a formulaic

recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Rather, "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief

that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial

plausibility when the plaintiff pleads factual content that allows [a] court to draw the

reasonable inference that defendant is liable for the misconduct alleged." *Id.* at 678; *see*

*also Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016).

Under Federal Rule of Civil Procedure 12(b)(6), a party may request dismissal of

---

[20] The Court recognizes Plaintiffs' frustration with their current situation in that, due to the City's mistake, they were suddenly hit with a heavily-increased utility rate. However, the FHA does not afford them relief. And, unfortunately, state law affords a municipality considerable leeway in setting utility rates, *City of Gainesville v. State of Florida*, 863 So. 2d 138, 147 (Fla. 2003). Nonetheless, Plaintiffs are not precluded from seeking other state-law remedies, if warranted.

a pleading that falls short of these requirements. In resolving such motions, courts limit their consideration to the face of the complaint, its attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007); *see also Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016). Dismissal is warranted if, assuming the truth of the factual allegations of the complaint in a plaintiff's favor, there is a dispositive legal issue which precludes relief. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

### B.   ANALYSIS

In their operative complaint, Plaintiffs allege that the City's imposition of the 2012 Policy violates their substantive due process rights. (*See* Doc. 52, ¶¶ 74, 75); *see also* Doc. 100, p. 5.) The Due Process Clause of the Fourteenth Amendment contemplates both substantive and procedural due process protections. *Zinermon v. Burch*, 494 U.S. 123, 125–26 (1990). A violation of either of these rights may form the basis for a claim under 42 U.S.C. § 1983. *McKinney v. Pate*, 20 F.3d 1550, 1555 (11th Cir. 1994) (en banc).

The substantive component of the Due Process Clause protects against deprivations of fundamental rights—that is, those created by the Constitution. *Greenbriar Vill., L.L.C. v. Mountain Brook, City,* 345 F.3d 1258, 1262 (11th Cir. 2003); *see also Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992). "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Thus, state-created

rights are generally not subject to substantive due process protection. *McKinney*, 20 F.3d at 1556.

However, the Eleventh Circuit has recognized at least one exception—the legislative act exception. *Lewis v. Brown*, 409 F.3d 1271, 1273 (11th Cir. 2005). Under this exception, "[w]here an individual's state-created right is infringed by a 'legislative act,' the substantive component of the Due Process Clause generally protects him from arbitrary or irrational action by the government." *Lewis*, 409 F.3d at 1273 (citing *McKinney*, 20 F.3d at 1557 n. 9). Typically, a "legislative act" is one that applies to a larger segment, if not all, of society. *Lewis*, 409 F.3d at 1273.

Here, both parties agree that the legislative act exception applies because the 2012 Policy affects all Oviedo utility customers, not just OTC. (Doc. 100, p. 5; Doc. 102, p. 2.) But, according to the City, the Due Process Claim still fails because: (1) it is barred by the applicable statute of limitations; and (2) it fails under a rational basis review. (Doc. 62, pp. 6–8; Doc. 102, pp. 2–4.)

Even assuming that Plaintiffs' Due Process Claim is not barred by the applicable statute of limitations, the Court finds that the 2012 Policy withstands rational basis scrutiny. Because, at best, Plaintiffs assert a state-created property right, the Court must review the Due Process Claim under a rational basis test. *See Kentner v. City of Sanibel*, 750 F.3d 1274, 1281 (11th Cir. 2014) (applying a rational basis test at the motion to dismiss stage after concluding that the legislative act exception applied to the plaintiff's substantive due process claim).

Under rational basis scrutiny, Plaintiffs have the burden of establishing that the challenged governmental action is arbitrary and not rationally related to a legitimate governmental purpose. *See Cook v. Bennett*, 792 F.3d 1294, 1300 (11th Cir. 2015); *see also Kentner*, 750 F.3d at 1281. This standard is highly deferential, as legislative acts are found unconstitutional "in only the most exceptional circumstances." *Kentner*, 750 F.3d at 1281 (citing *Williams v. Pryor*, 240 F.3d 944, 948 (11th Cir. 2001)).

With these legal principles in mind, the Court concludes that Plaintiffs cannot show that the 2012 Policy lacks a rational basis. Plaintiffs themselves plead at least one rational basis for the 2012 Policy in the operative Complaint—generating sufficient funds to operate the City's utility systems. (Doc. 52, ¶ 29.) Plaintiffs may not agree with the wisdom or fairness of this rationale, but this is not the test under a rational basis review. *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 945 (11th Cir. 2013). Hence the MTD is due to be granted in part.[21] Moreover, because amendment would be futile, the Court finds that the Due Process Claim is due to be dismissed with prejudice. *See Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).[22]

---

[21] In its MTD, the City also moves for dismissal of Plaintiffs' punitive damages claims. (Doc. 62, pp. 8–9.) However, on May 19, 2017, Plaintiffs filed a notice indicating their intent not to pursue punitive damages. (Doc. 79.) Hence that portion of the MTD is now moot.

[22] Because Plaintiffs have not sufficiently alleged a substantive due process violation, the Court need not reach the parties' summary judgment arguments with respect to the Due Process Claim. (*See* Docs. 64, 81.) Even under the summary judgment standard, viewing the facts in the light most favorable to Plaintiffs, the record reveals that they are not entitled to substantive due process protection.

#### IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.  Plaintiffs' Motion for Partial Summary Judgment and Incorporated Memorandum of Law (Doc. 57) is **DENIED**.

2.  Defendant City of Oviedo, Florida's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 64) is **GRANTED IN PART AND DENIED IN PART**.

    a.  The motion is granted as to Counts I–IV of the Second Amended Complaint (Doc. 52, ¶¶ 43–66).

    b.  In all other respects, the motion is denied.

3.  With respect to Counts I–IV of the Second Amended Complaint (Doc. 52, ¶¶ 43–66), the Clerk is **DIRECTED** to enter judgment in favor of Defendant the City of Oviedo, Florida and against Plaintiffs Oviedo Town Center II, L.L.L.P.; Oviedo LHC I, L.L.C.; Oviedo LHC II, L.L.C.; Oviedo LHC III, L.L.C.; Oviedo LHC IV, L.L.C.; Oviedo Town Centre Development Group, L.L.L.P.; Oviedo Town Centre II Partners, L.L.L.P.; Oviedo Town Centre III, L.L.L.P.; Oviedo Town Centre IV, L.L.L.P.; Atlantic Housing Partners L.L.L.P.; CPG Construction, L.L.L.P.; Concord Management, Ltd.; and South Fork Financial L.L.C.

4.  Defendant City of Oviedo, Florida's Motion to Dismiss Count V and the Punitive Damages Claims of Plaintiffs' Second Amended Complaint and

Incorporated Memorandum of Law (Doc. 62) is **GRANTED IN PART AND DENIED IN PART AS MOOT**.

    a.     The motion is granted as to Count V of the Second Amended Complaint (Doc. 52, ¶¶ 67–80).

    b.     In all other respects, the motion is denied as moot.

5.    Count V of the Second Amended Complaint (Doc. 52, ¶¶ 67–80) is **DISMISSED WITH PREJUDICE**.

6.    The Clerk is **DIRECTED** to terminate all outstanding deadlines and to close the file.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on August 23, 2017.

ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record